Argued and submitted July 3, affirmed December 26, 2007, petition for review denied March 26, 2008 (344 Or 390)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RASHAN SARAD BROWN,
*Defendant-Appellant.*

Umatilla County Circuit Court
CF000008; A126424

176 P3d 400

Andrew S. Chilton argued the cause for appellant. With him on the brief was Chilton, Ebbett & Rohr, LLC.

Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

ORTEGA, J.

## ORTEGA, J.

■ Defendant appeals a judgment of conviction for two counts of aggravated murder, ORS 163.095. He contends that the trial court erred by admitting evidence that, near the time of the murders, he entered into a conspiracy to murder a different victim. We review the trial court's ruling on the relevance of the evidence for errors of law, *State v. Hampton*, 317 Or 251, 254-56, 855 P2d 621 (1993), and affirm.

Defendant was convicted of murdering Torres and Wilde, who were killed by gunshot wounds and whose bodies were found very early in the morning of December 13, 1999. Shortly before the murders, defendant and his friend Powell made several attempts to set up a drug deal, initially using an intermediary named Weems and then making plans to buy drugs through Wilde. Although Powell refused to testify when called as a witness, other witnesses described the proposed drug deals. Providing some context, one witness explained, "You have to understand, when these people [who are attempting to sell the drugs] get together, they aren't very organized. They're pretty high."

A day or two before the murders, Weems tried to act as an intermediary for a deal in which defendant and Powell would buy about five ounces of methamphetamine from Nelson, who would obtain the drugs. Weems and Nelson made several unsuccessful efforts to meet with defendant and Powell. Weems twice called Powell to arrange meetings; each time, Powell told Weems to meet them on a road "[o]ut in the middle of farm country," but Powell and defendant did not show up as planned.

Finally, defendant and Powell met Weems and Nelson in a school parking lot. According to Nelson, Powell asked repeatedly to see the drugs, and Nelson responded by asking to see the money. Each time, Powell asked defendant, "Are we going to do it?" and defendant responded, "I don't know. I don't know." According to Weems, Powell "kept saying * * *, 'Should I do it? Should I do it?' " and defendant said nothing. Nelson noticed that "there was a clear outline of something in [defendant's] pants," which she thought was a

gun. She became nervous, made up a story about needing to get home to her children, and left with Weems.

Defendant and Powell then discussed a deal with the victims, Torres and Wilde. At first, Weems tried to organize a deal with Wilde and her supplier; the day after the failed deal with Nelson, Weems arranged a meeting. After one failed attempt to meet, Weems, Wilde, and Wilde's supplier met defendant (without Powell) in a field by a market, but that transaction did not go through because, according to Weems, defendant "was acting real sketchy" and "paranoid, like—he was, 'You're gonna try to kill me then take my money.'" Weems then gave up on the deal. Despite Weems's arguments against further pursuing a deal with defendant and Powell, Wilde asked Torres to supply drugs to sell to defendant. Wilde talked to Powell and arranged a meeting. Torres was supposed to give Wilde a ride to that meeting. Torres and Wilde left Weems's home between around 10:00 and 11:00 p.m. on December 12.

Between approximately 11:00 and 11:30 p.m., defendant rode his bicycle to the home of his friend, King, and asked for a ride. King, who had to work the next morning, said no, and defendant left.

Some time between 11:30 p.m. and midnight that same night, a witness, Sherrow, drove past the place where Wilde's and Torres's bodies were later found. Sherrow saw a "darker-skinned"—possibly black or Hispanic—man in dark clothes walking toward a bicycle that was about 10 to 20 feet away from a car.[1] The man was standing by the bicycle as Sherrow drove away. Another person was standing by the back passenger door of the car, but Sherrow did not get a good look at that person. Other than saying that the person by the car was wearing a dark jacket and was "lighter-skinned" and "[k]ind of" tall, Sherrow could not describe the person. She could not see anyone inside the car and did not see anyone else after she drove past the car. Sherrow knew Powell from having gone to school with him. She would have recognized Powell on sight, and she did not see him at the scene.

---

[1] Defendant is African-American. Numerous witnesses identified a particular bicycle as defendant's primary mode of transportation.

A City of Hermiston police officer found the victims' bodies shortly after midnight, in the very early hours of December 13. Torres's body was in a car, and Wilde's was on the ground by the car. The area of road where the bodies were found was somewhat isolated, poorly lit, and dark. No drugs were found at the crime scene. Although near the time of the murder a witness had seen Wilde counting money—about $2,500, which was to be used to buy a large amount of methamphetamine—that money was not found at the crime scene. Police found 15 shell casings at the scene, all of which were consistent with being fired from the same Glock firearm.

Very early that same morning, defendant again went to King's home. Claiming to have had an argument with his girlfriend, defendant asked to sleep there. He gave King $20 with instructions to tell the police, if they asked, that defendant had been there all night.

A witness who spent the whole day with defendant on the day after the murders testified that defendant seemed very nervous, particularly when he thought that a police officer was nearby. Defendant's pager went off constantly and at one point spelled out "escape."

Defendant reported to the police on December 14 that his bicycle had been stolen on December 11 (a day or so before the murders). However, witnesses had seen defendant with his bicycle on December 12 as late as 11:00 or 11:30 p.m. Near the time of defendant's report, an officer found the bicycle, which appeared to be in good condition, in a dumpster behind a local store.

Defendant quickly became a person of interest in the murders of Torres and Wilde. On December 14, police interviewed defendant, and he claimed not to know Torres, Wilde, or Powell. However, defendant not only had had the interactions with Wilde and Powell described above, but he also knew Torres because the two had worked together. Defendant also denied having a gun.

Defendant told the police that he had been at King's home from about 9:00 p.m. on December 12 through 10:30 a.m. on December 13 and that he had walked there because his bicycle had been stolen on December 11.

Although King initially corroborated that story, after officers explained that they were investigating a murder, King retracted that account.

At the end of the interview, defendant stood, and officers could see blood on his underwear, which was exposed above the waistline of his pants. After observing the blood, police told defendant that they would need to seize the underwear. Defendant started picking at the stain, then tried to tear it out, and, finally, while in a holding cell, removed the underwear and threw it in the toilet. An officer was able to retrieve the underwear immediately. Torres's DNA was found in one bloodstain on defendant's underwear, and a mixture of DNA belonging to Torres and defendant was found in another.

In addition to that evidence, the state offered testimony by another witness, Andrade, that shortly before the murders of Torres and Wilde, he, defendant, and Powell agreed to rob and murder a marijuana dealer identified simply as "Bob." Defendant contended that Andrade's testimony was inadmissible under OEC 404(3). After an offer of proof, the trial court found that the testimony was relevant to prove "motive, opportunity and plan" and to "demonstrate[ ] that the defendant intended to leave no witnesses, eliminate the evidence and target drug dealers, who were less likely to tell the police they had been robbed." Reasoning that the evidence "demonstrates planning and opportunity, rather than encouraging the jury to decide the present case on the basis of emotion," the court determined that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The court also made specific findings and concluded that the testimony was relevant to prove intent.

Andrade testified that he met defendant either a few weeks before defendant was arrested or "a matter of days" before the murders and that they and Powell made a plan to rob Bob of "his money and his dope" and kill him. According to Andrade, the plan was that "[w]e were just gonna knock on the door. He was going to throw me on the floor, and we're going in shooting, shooting anybody inside." Defendant said that they would kill the witnesses, all the people in Bob's home, and that no one would find out; he also said that, after

the crime, they had to get rid of the clothes they were wearing. Although Powell talked more than defendant, Powell appeared to do as defendant instructed.

■       As part of carrying out that plan, defendant, Andrade, and Powell went to the apartment complex where Bob lived. Defendant had a black handgun, and Powell also had a gun. Andrade went into Bob's apartment to talk with him, but Andrade decided not to proceed with the plan and told defendant that Bob did not really have anything worth stealing. Andrade described the way that the plan ended:

> "I'm like, 'I'm not going in there. I'm going home.' So then, from there, it ended.
>
> "* * * * *
>
> "I went home. He went his way. He said, 'You'll see me on the news, man. You'll see me on the news.' "

On appeal, defendant contends that Andrade's testimony amounted to inadmissible character evidence, in that the state's theories "rely on a hidden propensity inference within what might otherwise appear to be a non-character theory of admissibility." The state responds that the evidence was relevant to prove motive, plan and preparation, and intent, and therefore was correctly admitted. Because we conclude that Andrade's testimony was relevant to a non-character purpose—specifically, to show that, near the time of the murders, he was pursuing a plan consistent with the murders of Wilde and Torres and thus was more likely to be the person who killed the victims—we affirm.

We begin with the text of OEC 404(3), which provides:

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The Supreme Court has emphasized that the rule is inclusionary and that analysis of evidence under the rule should focus on logical relevance rather than labels:

"Notably, this court has observed that the rule stated in OEC 404(3) employs an 'inclusionary' approach to the prior bad act problem. *See State v. Johns*, 301 Or 535, 548, 725 P2d 312 (1986) (so stating). That means that, while the rule sets out a list of possible 'exceptions' to the general prohibition on prior bad act evidence ('motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident'), the rule does not purport to cover every imaginable purpose to which prior bad act evidence might logically and lawfully be applied. *Id.* at 549. Thus, the essential inquiry under OEC 404(3) is not whether the testimony can be made to fit into one of the listed categories, but whether and how it is logically relevant to a noncharacter issue in the case. *Id.*"

*State v. Johnson*, 340 Or 319, 338, 131 P3d 173 (2006); *see also Johns*, 301 Or at 549 ("The admissibility of evidence of other crimes must not be based upon the relationship of the evidence to one of the listed categories; rather it must be based on its relevancy to a fact at issue in the trial.").

Thus, the admissibility of such evidence depends on whether the evidence is relevant to a fact at issue.[2] *Johns*, 301 Or at 549. Uncharged misconduct evidence "may be admissible to prove *other* facts that are relevant in the case, as long as the chain of logical relevance connecting the evidence to the 'other' fact or facts does not ultimately rely on an inference relating to the defendant's character or propensities." *Johnson*, 340 Or at 338 (citations omitted; emphasis in original).

Defendant contends that, "[t]o demonstrate a common scheme or plan, the state must show that there was a singular objective of which both the other bad act and the charged conduct were a part." He contends that the evidence

---

[2] Under OEC 404(3), the evidence of uncharged misconduct must (1) be independently relevant for a noncharacter purpose, (2) be supported by sufficient proof that the defendant committed the act of uncharged misconduct, and (3) have probative value that is not substantially outweighed by the risk of unfair prejudice. *Hampton*, 317 Or at 254. When such evidence is offered as proof of intent or absence of mistake, other factors must be established. *Johns*, 301 Or at 555-56. As the parties frame their arguments here, the focus is on whether Andrade's testimony was independently relevant to a noncharacter purpose. Defendant does not contend that the trial court erred in its conclusions regarding either the sufficiency of proof or the weighing of the probative value of Andrade's testimony against the danger of unfair prejudice.

here did not show that there was an "overarching plan" that involved both the conspiracy against Bob and the robbery and murders of Torres and Wilde. The state responds that the evidence of the conspiracy was relevant to show defendant's plan and preparation for the robbery and murders. In the state's view, the conspiracy to use a handgun to rob Bob of drugs and money and then kill him to avoid leaving witnesses establishes a higher probability that defendant used the same plan to "carr[y] out the robbery and murder of two people, one of whom intended to sell defendant drugs. Stated yet another way, as the trial court found, the evidence of the prior act is relevant to show defendant's plan to target drug dealers and to leave no witnesses behind." We agree.

Here, Andrade's testimony shows defendant's conduct in planning and preparing to rob and murder drug dealers in the period immediately before the charged murders and defendant's intent to continue to pursue that plan after abandoning the initial version of it. The testimony demonstrates that defendant formed a plan in relation to Bob shortly before Wilde and Torres were murdered. The plan was to rob and murder a drug dealer, using a gun and leaving no witnesses. Andrade's testimony showed that defendant had a gun at that time and that Bob was chosen because he could be robbed "of his money and his dope." The plan was terminated as to Bob because Andrade told defendant that Bob did not have anything worth stealing and Andrade declined to go through with the plan. When the plan as it involved Bob ended, defendant told Andrade, "You'll see me on the news," suggesting that he still intended to carry out a similar plan.

Other evidence admitted at trial tends to show that defendant continued to pursue that plan as he attempted to engage in drug deals with Nelson and Weems in isolated locations. Nelson, who became too afraid to complete a deal, thought that defendant had a gun when they met. Weems gave up on the deal the next day because defendant "was acting real sketchy."

It follows, then, that the evidence about the murders of Torres and Wilde is consistent with an overall plan to rob and kill drug dealers, using a gun and leaving no witnesses.

Concededly, that plan was not elaborate and detailed. As defendant notes, there were some differences between the conspiracy against Bob and the murders of Torres and Wilde. The conspiracy was to be completed in Bob's home rather than by the side of a road, and the conspiracy apparently involved more perpetrators than the murders did. Nevertheless, the conspiracy and the actual murders were closely linked in time and their essential elements. Andrade's testimony shows that the essence of the plan involving Bob was to rob and kill a drug dealer to obtain money and drugs. That was the overall scheme in which defendant was engaged. Nothing suggests that the location of the crimes or the number of perpetrators to be involved was a focal point of the plan. Rather, Torres and Wilde, who were drug dealers, were murdered, shot multiple times by a single gun, and a factfinder could infer that they were robbed of drugs and money at the time they were murdered—all of that is consistent with the overall plan to rob and kill a drug dealer.

■    Nor was the scheme at issue so broadly conceived as to encompass any criminal activity that defendant might have engaged in after the failure of the conspiracy against Bob. Rather, Andrade's testimony shows that defendant was engaged in a plan to rob and murder a particular type of victim to get money and drugs, took steps to prepare for those crimes, possessed a firearm for use in such a crime, and continued to adhere to the plan after abandoning pursuit of his original target, Bob. This case, therefore, is different from *State v. Manrique*, 271 Or 201, 531 P2d 239 (1975), in which evidence of prior heroin sales was not admissible in a trial on charges arising from a later heroin sale. Rejecting the state's argument that the earlier sales showed the defendant's "modus operandi" and thus his identity as the seller of the drugs at issue, the *Manrique* court explained that that theory of admissibility is available only when the uncharged misconduct and the charged crime "were so nearly identical in method as to earmark them as the handiwork of the accused, so as to identify him as the person who committed the crimes, but much more is demanded than the mere repeated commission of crimes of the same class." *Id.* at 208 (internal quotation marks and citations omitted). Here, the state does not contend that the conspiracy against Bob and the murders of

Wilde and Torres involved elements so unusual that the same person must have carried out both crimes, nor would such a contention be persuasive.

Unlike the evidence at issue in *Manrique*, Andrade's testimony relates not merely to the repetition of a type of crime but to planning and preparation to commit a crime against a drug dealer shortly before the charged crimes occurred, coupled with a statement suggesting that defendant wanted to continue to pursue that plan. The evidence thus allows an inference that the murders of Torres and Wilde, which were consistent with that plan, were the completion of a crime that defendant had been planning and pursuing in the days immediately before the murders.

That inference is not about defendant's character, but about the ways that his conduct increases the likelihood that he killed the victims of the charged murders. Moreover, the chain of inferences that establishes relevance in this case does not depend on a premise that defendant is a person of bad character and therefore more likely to carry out crimes. In other words, the relevance of Andrade's testimony does not depend upon an assumption that a person who plans to kill one victim is more likely to kill another. Rather, the inferences that are relevant here depend on the evidence that, at the pertinent time, defendant had a scheme similar to the crimes that actually occurred and was preparing to carry out that scheme. Although defendant was diverted from carrying out the crime against Bob, his planning and preparation for that crime make it more likely that he was able to and, in fact, did complete the crime against Torres and Wilde. It is reasonable to infer that participation in a plan, coupled with the desire to continue with that plan, increases the likelihood that the participant will carry out the plan. In light of defendant's planning and intention in the period immediately before the charged murders, Andrade's testimony reasonably supports an inference that defendant was the person who killed the two victims. The evidence, therefore, is relevant to the key issue in the case.

In some ways, the facts of this case resemble those in *State v. Gibson*, 338 Or 560, 572, 113 P3d 423, *cert den*, 546

US 1044 (2005), even though the *Gibson* court did not identify "plan" or "preparation" as a consideration in its analysis of the OEC 404(3) question. In *Gibson*, the defendant was charged with murder, and the key issue was whether the defendant or another person, Herlong, shot the victim. 338 Or at 564. The disputed evidence was testimony that, less than a week before the murder, Herlong and the defendant discussed robbing a sandwich shop, and the defendant fired a gun at a sandwich shop's door in preparation for the robbery. Rejecting the defendant's OEC 404(3) argument, the court stated that the evidence

> "placed [the] defendant with Herlong in a situation where the two contemplated committing a violent crime less than a week before the charged murder occurred; it placed what would later be the murder weapon—which sometimes [the] defendant claimed not to own—in [the] defendant's possession; and it showed [the] defendant firing that weapon. Each of those facts was independently relevant to the issues in the case."

*Id.* at 572

Regardless of how we label the relevance of Andrade's testimony, its import is similar to that of the evidence in *Gibson*. Andrade's testimony showed that defendant was planning a similar crime shortly before the charged murders. Although Andrade was not able to describe defendant's gun with precision, and it is impossible to say whether the gun in defendant's possession during the conspiracy to rob Bob was the same weapon used in the murders, Andrade's testimony did place a gun in defendant's hands shortly before the murders of Torres and Wilde, contrary to defendant's claim that he did not have a gun. As in *Gibson*, that evidence is relevant and does not depend on an inference about defendant's character.

Affirmed.