Argued and submitted March 10, 2020; affirmed November 17, 2021; petition for review allowed in part, limited to first question presented—as to that issue, decision of Court of Appeals vacated, case remanded to Court of Appeals for reconsideration in light of *State v. Jackson*, 368 Or 705, 498 P3d 788 (2021), April 21, 2022 (369 Or 675)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## KEVIN LAVIN TAYLOR,
aka Kevin Lavan Taylor,
*Defendant-Appellant.*

### Multnomah County Circuit Court
17CR26979; A168298

501 P3d 7

In this criminal appeal, defendant contests his conviction of third-degree sexual abuse. On appeal, defendant argues that the trial court erred by admitting certain other-acts evidence. Specifically, defendant contends that security camera video of an encounter with an unknown victim, taken shortly before the charged act, was not relevant for any nonpropensity purpose and should have been excluded under OEC 404(3). *Held*: Given the many similarities between the earlier encounter and the charged conduct, the challenged evidence was probative of both defendant's plan to sexually abuse a woman on that day and defendant's related mental state. Thus, the court did not err in concluding that the evidence was relevant for a nonpropensity purpose and admitting it on that basis.

Affirmed.

Benjamin N. Souede, Judge.

David Sherbo-Huggins, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Patrick M. Ebbett, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

DeHOOG, J.

Affirmed.

**DeHOOG, J.**

In this criminal appeal, defendant contests his conviction for third-degree sexual abuse. In a single assignment of error, defendant argues that the trial court erred in admitting, under OEC 404(3), other-acts evidence depicting defendant's encounter with a woman other than the victim of his sexual-abuse charge shortly before his encounter with the victim. For the reasons that follow, we conclude that the trial court did not err in admitting the challenged evidence as probative of defendant's plan and related mental state. Accordingly, we affirm.

We review a trial court's determination of relevance under OEC 401 for errors of law. *State v. Stockton*, 310 Or App 116, 123, 483 P3d 657 (2021). We likewise review a trial court's determination that other-acts evidence is relevant and admissible under OEC 404(3) for legal error. *Id.* In this case, the trial court ruled that the challenged evidence was relevant and admissible under OEC 404(3) during a pretrial hearing on defendant's motion *in limine*; thus, our review is limited to the record that was before the trial court at that time. *See State v. Warren*, 291 Or App 496, 510, 422 P3d 282, *rev den*, 363 Or 744 (2018). We state the facts accordingly.

One afternoon, J, the victim in this case, was studying on the first floor of the library at her community college. While J was seated at a large table divided into study carrels, a man later identified as defendant sat down next to her. After seating himself, defendant "slowly encroached upon [J's] space," causing her to respond by "stomp[ing] on his foot at one point."[1] Even after J asserted her personal space in that manner, the encroachment continued, and, ultimately, "[J] felt [defendant's] hand reach under [the desk] and touch [J's] vagina, sort of around the pubis." J stood up, gathered her books, and moved to a different table. A few minutes later, J texted a friend about the touching, and, after an exchange of messages, she reported the incident to a librarian and campus security.

Before trial, defendant sought to preclude the state from showing the jury video footage recorded by a security

---

[1] At trial, J further described defendant's conduct as "man spreading."

camera on another floor of the library shortly before his encounter with J. According to defense counsel, the video would show

> "that [defendant] went upstairs. He selected a book. He sat down in a cubicle next to a woman. He got up and then went back. And then over the course of about 30 minutes, his leg extended over towards the woman and then was near the woman for a while. And then she got up and left.
>
> "And then a couple minutes later, [defendant] got up and left and then he walked downstairs and he sat down next to [J]."

Defendant denied having had any contact with the woman shown on the video. Although the state was apparently unable to identify that person as a potential witness, the state charged defendant with third-degree sexual abuse and harassment related to the upstairs encounter. Defendant waived his right to a jury trial on those charges and, following a bench trial, was acquitted of those offenses.

As for the charges related to J, defendant asserted that, because he had waived jury as to the charges arising from the upstairs incident, the security footage of that incident was not relevant to any charge being tried to the jury. Defendant further contended that the jury would be confused by the challenged video evidence because "[it] doesn't show any crime has been committed" and, thus, should be excluded as unfairly prejudicial under OEC 403.[2] Finally, defendant argued that the evidence was "pure propensity" evidence and should be excluded under OEC 404(3).

The state countered that the video was relevant to establish defendant's mental state, specifically to show that defendant had knowingly or intentionally subjected

---

[2] Contrary to counsel's apparent understanding, the admissibility of other-acts evidence does not depend on whether the other acts were themselves criminal. *See* OEC 404(3) (permitting admission of "[e]vidence of other *crimes, wrongs or acts*" for various purposes other than "to prove the character of a person in order to show that the person acted in conformity therewith," including such things as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" (emphasis added)). Defendant does not reprise that argument on appeal, nor does he contend that, to the extent that the disputed evidence was relevant, the video was subject to exclusion under OEC 403 for any other reason.

J to sexual contact. The state noted that the video recording depicted conduct consistent with the behavior that J had described defendant engaging in with regard to her, namely, defendant (1) wandering through the same library on the same day; (2) choosing—from among other available options—an empty seat next to a woman who, like J, was seated alone at a table divided into study carrels; and (3) gradually spreading out his legs to the point that they extended into the woman's personal space.[3] Given those similarities, the state argued that the video was relevant to prove that defendant had engaged in knowing conduct with respect to J, because it suggested that his contact with her had not been a mistake, demonstrated defendant's motive in approaching J, and reflected defendant's plan and preparation in approaching each of the women in the library.

After reviewing the video, the court concluded that it was admissible, stating:

> "Having watched the video confirmed my earlier inclination. I find that the video is relevant and is relevant for a nonpropensity purpose, for purposes, that is, to prove motive, plan, preparation and * * * absence of mistake.
>
> "* * * * *
>
> "[T]he motive part being to be seated close enough to a woman sitting alone to allow for, at the very least, putatively incidental touching and potentially would allow for more than incidental touching."

At trial, the state played the challenged video recording before the jury during its case-in-chief and while cross-examining defendant. The jury ultimately found defendant guilty of third-degree sexual abuse, ORS 163.415. Defendant appeals the resulting conviction, assigning error to the admission of the video recording of the upstairs encounter.

On appeal, defendant argues that the video evidence was not relevant for any of the purposes advanced by the state and that its admission at trial was harmful. In response, the state primarily argues that the challenged

---

[3] Defendant did not (and does not) dispute the state's characterization of what the video recording depicts or the overall similarities between the encounters.

video was relevant to show that defendant had a plan to commit sexual abuse in the library at the time of the charged crime, and that, as evidence of defendant's plan, the challenged evidence was also probative of defendant's motive and the absence of any mistake on his part—in other words, that defendant acted pursuant to that plan.

Under OEC 404(3), "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person to show that the person acted in conformity therewith." Other-acts evidence may, however, be admitted "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* As has often been said, OEC 404(3) is an inclusive—rather than exclusive—rule of evidence, meaning that other-acts evidence may be admissible "so long as it is relevant for any purpose other than to prove propensity." *State v. Turnidge (S059155)*, 359 Or 364, 429, 374 P3d 853 (2016), *cert den*, ___ US ___, 137 S Ct 665 (2017). That is, the admissibility of other-acts evidence is not controlled by the relationship of the evidence to one of OEC 404(3)'s enumerated purposes; rather, its admissibility turns on whether it is relevant to a fact at issue in some way other than proving a propensity to commit certain acts. *State v. Pitt*, 352 Or 566, 576, 293 P3d 1002 (2012). Notably, however, evidence that is admissible under OEC 404(3) remains subject, upon request, to OEC 403 balancing of its probative value against its potential for unfair prejudice and other concerns. *See State v. Baughman*, 361 Or 386, 404-05, 393 P3d 1132 (2017).

As noted, the state argues that the challenged evidence was properly admitted by the trial court for the non-propensity purpose of proving a plan. Specifically, the state contends that the video evidence of defendant sitting next to another woman and engaging in "protracted man spreading with his legs" to the point of physical contact demonstrates that he had engaged in a "kind of preparatory step or trial run before engaging in the charged conduct" towards J.

Plan, which is an established theory of admissibility for other-acts evidence under OEC 404(3), is further divided into two categories: Evidence either may tend to show that a person acted pursuant to a "true plan," or it

may reflect a "spurious plan." *Turnidge*, 359 Or at 439. In a true-plan scenario, the other-acts evidence is offered to "show that the defendant in fact and in mind formed a plan, including the charged and [other acts] as stages in the plan's execution." *Id.* (internal quotation marks and some brackets omitted). In contrast, evidence of a spurious plan consists of other-acts evidence "offered to show that a defendant engaged in a pattern or systematic course of conduct *from which* the existence of a plan is to be inferred." *Id.* (emphasis in original).[4]

We understand the state's argument to focus on the true-plan rationale. The facts of *Turnidge* illustrate that rationale. In *Turnidge*, the Supreme Court concluded that evidence of a 1995 bomb threat qualified as true-plan evidence under the state's theory that the bomb threat was a trial run for the later 2008 bombing that gave rise to the defendant's charges. *Id.* at 441. The challenged other-acts evidence in *Turnidge* consisted of testimony that, in 1995, the defendant had made a bomb threat to a local bank and directed the teller to take $50,000 to an outhouse located at a construction site near the bank. *Id.* at 426. From a vantage point at a nearby restaurant, the defendant and the witness had been able to observe the manner in which the police responded to the bank and examined the outhouse. *Id.* Even though the previous act and the charged acts had occurred 13 years apart, the relationship that they seemed to bear—including that both had occurred in the same small town of Woodburn, both had been located conveniently close to Interstate 5, and both had involved threatening phone calls and specific instructions to bank tellers—supported the inference that the defendant's earlier conduct had been a trial run that enabled him to gauge the likely response by law enforcement and bank personnel; that is, the defendant's earlier conduct was logically probative of a true plan

---

[4] One commentator who, as discussed below, is skeptical of the admission of other-acts evidence to prove something other than a "true" plan finds support for his skepticism in the term "spurious," which he understands other commentators to use as a pejorative. *See* Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 3:23 (2021). While we do not dispute that understanding of the scholarly literature on the subject, we do not necessarily view the Supreme Court's use of the term "spurious" as reflecting similar skepticism.

to commit the charged offenses, of which the 1995 bomb threat had been a preparatory step. *Id*. at 440-42.

The state argues that, as in *Turnidge*, the video footage of defendant's earlier encounter with the woman on the upper floor of the library depicts a "preparatory step" or "trial run" undertaken as part of defendant's plan to assault J. However, citing *State v. Brown*, 217 Or App 330, 176 P3d 400 (2007), the state alternatively argues that defendant's upstairs encounter "suggested that the charged act was the completion of a crime that defendant had been pursuing immediately beforehand." We turn to the facts of *Brown* before deciding whether evidence of the earlier encounter was admissible to establish a "true plan."

In *Brown*, the defendant appealed his conviction for aggravated murder, contending that the trial court had erred in admitting evidence of a plan and aborted attempt to rob and kill one drug dealer a few days before the defendant engaged in the charged conduct, which involved robbing and killing two other drug dealers. *Id.* at 335-36. We concluded that the evidence was properly admitted. *Id.* at 340. We explained that the evidence "allow[ed] an inference that the murders \* \* \*, which were consistent with that plan, were the completion of a crime that defendant had been planning and pursuing in the days immediately before the murders." *Id*. Specifically, the challenged evidence in *Brown* demonstrated the full plan to "target drug dealers and to leave no witnesses behind."[5] *Id.* at 338. That evidence of a full plan from the previous episode allowed a noncharacter inference that the "defendant had a scheme similar to the crimes that actually occurred and was preparing to carry out that scheme." *Id.* at 340. More specifically, we explained that the evidence showed that the defendant "was engaged in a plan to rob and murder a particular type of victim to get money and drugs, took steps to prepare for those crimes, possessed a firearm for use in such a crime, and continued

---

[5] The challenged evidence in *Brown* consisted of testimony claiming that the defendant, the witness, and a third person had agreed to rob and murder a marijuana dealer. *Brown*, 217 Or App at 335. In the course of carrying out the plan to go to the marijuana dealer's apartment, knock on the door, and "go[ ] in shooting," the defendant discovered that the marijuana dealer did not have anything worth stealing and instead simply went home. *Id.*

to adhere to the plan after abandoning pursuit of his original target[.]" *Id*. at 339.

We are not persuaded that the evidence of defendant's earlier conduct is admissible as true-plan evidence under either a "preparatory step" or a "completion of a crime" theory. Unlike in *Turnidge*, here, there is no non-speculative basis to infer that defendant stood—or at least hoped—to learn something from his conduct with the woman upstairs that would inform and assist him when he sexually assaulted J a short time later. In *Turnidge*, the defendant was able to determine the likely institutional responses of law enforcement agencies and banking officials; responses that often are governed by institution-wide policies and may well remain consistent over time. Here, on the other hand, the purported targets of defendant's behavior were individual persons, and each could have responded to his uninvited approach in any number of different ways, none of which would have helped defendant predict how the other would respond under the same circumstances. *Cf. State v. Leistiko*, 352 Or 172, 181, 282 P3d 857 (2012) (reasoning that the fact "that one woman consented (or refused to consent) to have sexual relations with [the] defendant does not mean that another woman made the same choice"). Thus, we conclude that the evidence does not qualify as plan evidence under a "preparatory step" or "trial run" theory.

Further, we do not find our opinion in *Brown* particularly relevant here, where there is no direct evidence that defendant's behavior around the first woman was itself in pursuit of a plan. *See* 217 Or App at 335-36 (describing the defendant's abandoned plan to rob and murder a marijuana dealer). Although there are certainly similarities between the two encounters in this case that might suggest a common objective—*i.e.*, a spurious plan, as we discuss below—nothing here is comparable to the evidence in *Brown*, where the completed crimes were shown to be the culmination of an explicit plan that began with the abandoned attack on a penurious marijuana dealer. Thus, nothing we said in *Brown* persuades us that the video footage in this case was admissible as true-plan evidence under a "completion of a crime" theory either.

That does not end our inquiry. Although the state does not emphasize a spurious-plan theory in support of the trial court's ruling,[6] the court did not specify which theory, if either, it was relying on when it admitted the security-video evidence over defendant's objection. Moreover, as noted, the question whether evidence is relevant and admissible under OEC 404(3) is a legal question based on the record established at the motion hearing. Thus, we proceed to consider whether the disputed video evidence qualified for admission as evidence of a spurious plan.

As the Supreme Court explained in *Turnidge*, spurious-plan evidence is evidence that a person has engaged in a series of similar acts and is "offered to establish [a] plan or design to commit those acts." 359 Or at 439 (citing *Leistiko*, 352 Or at 188 n 13). Discussing one commentator's view of the principle, the court further explained that such evidence is used

> "to prove a plan or design aimed to show a precedent design that in turn shows, by probability, '"the doing of the act designed."' [*Leistiko*,] 352 Or at 188 (quoting [John Henry] Wigmore, 2 *Evidence* § 304[,] 249 [Chadbourne rev. 1979]). In Wigmore's view, to be logically relevant to prove [the existence of a plan or design], the proponent must show not only a similarity between the prior act and the charged act, but also 'such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' 352 Or at 188 (citing Wigmore, 2 *Evidence* § 304 at 249 (emphasis from *Leistiko* omitted))."

*Turnidge*, 359 Or at 438. The court acknowledged, as it had in *Leistiko*, that a second commentator advocated a "slightly different view" than Wigmore did, and would require, before using "prior bad acts evidence" in that manner, that the evidence be "sufficient to establish a *modus operandi*."[7] *Id.*

---

[6] Defendant characterizes the state's argument on appeal as *only* relying on a spurious-plan theory. As our above discussion indicates, we do not understand the state's argument to be limited in that way. Indeed, as noted, we understand the state's primary argument to be based on a true-plan theory under *Turnidge* and *Brown.*

[7] In *State v. Johnson*, 313 Or 189, 197, 832 P2d 443 (1992) (*SA Johnson*), the Supreme Court held that, for prior-acts evidence to be admissible to establish a *modus operandi* (also known as a "signature crime") probative of identity, the

(discussing Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 3:24 (2009)). "Otherwise, the evidence is 'vulnerable to the claim that the prior bad acts are merely propensity evidence.'" *Turnidge*, 359 Or at 438 (quoting *Leistiko*'s acknowledgement of Imwinkelried's concerns).

The *Turnidge* court noted that it had ultimately been unnecessary in *Leistiko* "to decide between Wigmore's [and] Imwinkelried's views, because both sources required *** 'something more than the similarity required for other crimes evidence to be admissible to prove intent *** for it to be admissible to prove a plan.'" 359 Or at 439 (quoting *Leistiko*, 352 Or at 189). Since the court in *Leistiko* had already concluded that the disputed evidence in that case was not admissible to prove intent, there was no need to determine what further showing the court would have required for the evidence to be admissible to prove the existence of a plan. *Id.*

Here, on the other hand, we must determine whether the disputed evidence is sufficiently similar to the charged encounter for it to be admissible as evidence of a plan. Before undertaking that inquiry, we must make the choice between Wigmore and Imwinkelried that the Supreme Court left for another day in its *Leistiko* decision. For the reasons briefly set out below, we conclude that the state was not required to satisfy the heightened standard associated with Imwinkelried and applicable to *modus operandi* evidence to gain admission for the other-acts evidence at issue in this case.

Our rationale for rejecting that standard—at least as to the evidence at issue in this case—is quite simple. Unlike *modus operandi* evidence, and unlike *some* plan evidence, the evidence at issue here was not offered to establish

---

state had to establish "by a preponderance of the evidence that there is (1) a *very high degree of similarity* between the prior and charged misconduct, and (2) a *distinctive nature of the methodology* of prior and charged misdeeds." (Footnote omitted; emphasis in original.) In concluding that the state had not met its burden, the court acknowledged one distinctive similarity (the use of a telephone cord as a ligature to murder the victim) but held that, in light of the large number of *dissimilarities* between the two murders, the state had not "establish[ed] a methodology that is so distinctive as to support a rational inference of a signature crime." *Id.* at 197.

defendant's identity as the person who assaulted J; the identity of the alleged perpetrator was not disputed. As we understand the state's theory of admissibility, it viewed the other-acts evidence to be probative of what defendant was doing when he encountered J and why he was doing it, *i.e.*, what his purpose was in carrying out the encounter.[8]

When the state offers other-acts evidence to establish the identity of an unknown perpetrator, our courts require that the two acts be both very similar and highly distinctive, because it is the unique character of the repeated behavior that tends to show that the same person committed both acts. *See State v. Johnson*, 340 Or 319, 339-40, 131 P3d 173, *cert den*, 549 US 1079 (2006) ("[I]f evidence of prior crimes is to be admitted to prove identity based on *modus operandi*, the trial court must find a very high degree of similarity between the charged and uncharged crimes, as well as a methodology that is highly distinctive."); *State v. Johnson*, 313 Or 189, 196, 832 P2d 443 (1992) (the distinctiveness of the conduct must be such that "the methodology is attributable to only one criminal, that is, the methodology is [sufficiently] distinctive so as to earmark the acts as the handiwork of the accused").[9]

Where, on the other hand, the identity of the perpetrator is known, the other-acts evidence is not required to carry such a heavy burden. That is, the jury need not be persuaded that, given the distinctive quality of two acts, they can only have been committed by the same person. Where the jury is not being asked to draw that inference, there is no reason to require that the two acts be similar and distinctive

---

[8] We recognize that Wigmore appears to distinguish *both* uses of spurious-plan evidence from evidence used to prove intent. *See California v. Ewoldt*, 7 Cal 4th 380, 394 n 2, 867 P2d 757 (1994) (discussing 2 Wigmore, § 300 at 238; § 410 at 477, and distinguishing between plan evidence used to prove identity and that used to prove that the defendant did the thing alleged). We see no reason, however, that evidence that a person acted in accordance with a plan would not *also* be probative of the person's objective in carrying out that plan, *i.e.*, the person's intent. Thus, even if the state must lay a different foundation for the evidence to be admissible as spurious-plan evidence, the resulting evidence may well be relevant to prove intent or another mental state.

[9] To avoid potential confusion, we refer to *State v. Johnson*, 340 Or 319, 131 P3d 173, *cert den*, 549 US 1079 (2006), as "*MA Johnson*" and *State v. Johnson*, 313 Or 189, 832 P2d 443 (1992), as "*SL Johnson*." Those cases involved different defendants and were decided 14 years apart.

enough to support it. Here, where the desired inference is that, when defendant engaged in similar courses of conduct, he was doing so pursuant to a common plan, it should be sufficient that the two acts be similar enough to support *that* inference. *See MA Johnson*, 340 Or at 339-40 ("[W]hen prior crime evidence is admitted to prove intent, this court has indicated that a high degree of similarity is helpful but is not essential, and that a distinctive methodology is entirely irrelevant."); *id*. at 340 (requiring only that other-acts evidence be such that it "would support the narrow inference that the state seeks to draw from it").

In a case such as this one, where a jury is being asked to draw the inference that a defendant carried out two encounters pursuant to a common plan—and arguably a common purpose—we conclude that the standard articulated in Wigmore and discussed in *Leistiko* should apply. *See Leistiko*, 352 Or at 188 (discussing Wigmore and *MA Johnson*, 340 Or at 340, and noting distinction between evidence admitted to prove intent and that used to establish *modus operandi*); *see also* Imwinkelried, *Uncharged Misconduct Evidence* § 3:26 (discussing California Supreme Court's decision in *California v. Ewoldt*, 7 Cal 4th 380, 867 P2d 757 (1994), and noting one scholar's suggestion that, although *Ewoldt* dialed back the California Supreme Court's earlier prohibition against spurious-plan evidence, that case could be understood to apply less stringent test to plan evidence offered only to prove that a defendant did the charged act while retaining the more stringent *modus operandi* standard for evidence used to prove identity).

And, as the Supreme Court explained in *Leistiko*, Wigmore would apply the following standard:

> "Wigmore reasons explicitly, as [*MA*] *Johnson* did implicitly, that a pattern of prior similar acts may be admissible to prove a plan or design. Wigmore, 2 *Evidence* § 304 at 249; [*MA*] *Johnson,* 340 Or at 340-41. \*\*\* As Wigmore explained, in order to infer a plan or design from prior similar acts, the proponent of the evidence must show "not merely a similarity in the results, but *such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.*" Wigmore, 2 *Evidence* § 304

at 249 (emphasis in original); *cf.* [*MA*] *Johnson,* 340 Or at 340 (explaining that the prior bad acts evidence in that case established a greater connection than that required to prove intent but less than that required to establish *modus operandi*)."

*Leistiko*, 352 Or at 188. Further, although the court in *Leistiko* indicated that the degree of similarity required to admit spurious-plan evidence for any purpose was greater than that required for purposes of proving intent, two things are noteworthy. One, the court did not identify any particular degree of similarity for admitting prior-acts evidence to prove intent. And, two, "intent" in that context may well have been something other than intent within the specific meaning of OEC 404(3). As the court recognized in *Leistiko*, "Wigmore used the word 'intent' broadly." *Leistiko*, 352 Or at 184 n 9.[10]

Thus, to determine whether the evidence of defendant's conduct with each of the two women was sufficiently similar for the court to admit it on a spurious-plan basis, we must (1) evaluate whether the state has shown "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations," *Leistiko*, 352 Or at 188 (quoting Wigmore, 2 *Evidence* § 304 at 249 (internal quotation marks and emphasis omitted)); and (2) if so, ascertain that, in the words of *Leistiko*, there is "something more than the similarity required for other crimes evidence to be admissible to prove intent," *Leistiko*, 352 Or at 189. For the reasons that follow, we conclude that the other-acts evidence in this case met those standards.

---

[10] Discussing Wigmore, 2 *Evidence* § 301 at 238, the court elaborated as follows:

"He explained that 'intent more frequently signifies \*\*\* merely the absence of accident, inadvertence, or casualty—a varying state of mind which is the contrary of an innocent state of mind.' *Id.* Accordingly, when Wigmore, and [*State v.*] *Johns*[, 301 Or 535, 725 P2d 312 (1986),] in reliance on Wigmore, refers to the absence of mistake or accident as the equivalent of intent, it does not appear that either is using intent only in the limited sense that the Oregon criminal statutes use that term. *Cf.* ORS 161.085(7) (defining intentionally or with intent)."

*Leistiko*, 352 Or at 184 n 9 (omission in original).

We begin by reviewing why, in *Leistiko*, the proffered evidence fell short of being admissible to prove intent and therefore necessarily fell short of either of the more stringent foundations for spurious-plan evidence. In *Leistiko*, the Supreme Court held that evidence of uncharged conduct was not sufficiently similar to the charged offenses based, in part, on its consideration of the approach that it had taken in *State v. Johns*, 301 Or 535, 725 P2d 312 (1986).[11] *Leistiko*, 352 Or at 186. Quoting *Johns*, the court explained that,

> "[a]lthough this court recognized in *Johns* that 'sometimes one prior similar act will be sufficiently relevant for admissibility,' it cautioned that whether one prior similar act will suffice '[d]epend[s] upon the circumstances[.]' 301 Or at 555. As the court explained, '[a] simple, unremarkable single instance of prior conduct probably will not qualify, but a complex act requiring several steps, particularly premeditated, may well qualify.' *Id.*"

*Leistiko*, 352 Or at 186 (brackets in *Leistiko*). Based on the facts of that case, the court concluded that the defendant's use of force to compel a woman to engage in sexual intercourse with him was not a "complex factual scenario" probative of the defendant's intent as to the charged offense—rather, it was nothing "other than an unremarkable single instance of prior conduct." *Id.* (internal quotation marks omitted).

Although in this case defendant's conduct also did not involve a "complex factual scenario," we would not characterize the behavior depicted on the video as an "unremarkable single instance of prior conduct." Based on the content of the video, the jury reasonably could infer that defendant had patrolled the library exploring his options, that he had purposely selected an empty seat next to a woman seated alone, and that he had incrementally "encroached" upon

---

[11] The Supreme Court overruled, in part, its *Johns* decision in *State v. Skillicorn*, 367 Or 464, 493, 479 P3d 254 (2021), to disallow the use of uncharged misconduct under a "doctrine of chances" theory to show that, because a defendant has previously engaged in deliberate conduct, the defendant is more likely to have engaged in the charged conduct deliberately. We do not, however, understand *Skillicorn* to have wholly disavowed the *Johns* opinion, and particularly not its identification of factors that a trial court should consider when determining whether a prior instance of conduct is probative of a defendant's mental state at the time of a charged offense.

the woman's personal space in a manner that she might consider rude but ultimately innocuous, all with the goal of lowering her guard so as to give defendant the opportunity to sexually assault her (as well, perhaps, as plausible deniability).

Moreover, even if defendant's conduct around the other woman would itself be insufficient to give rise to such inferences, that conduct, in conjunction with his conduct around J, readily supported such inferences. That is, defendant's conduct in both instances was strikingly similar in that it occurred in the same library at essentially the same time, involved virtually identical circumstances (with defendant unnecessarily seating himself next to a woman seated alone and gradually extending his legs into her space), and ultimately resulted in close physical proximity between defendant's body and each woman's body under circumstances that clearly did not require such proximity. And, unlike the circumstances in *Leistiko*, here there are no apparent *dissimilarities* between the two encounters other than that they happened to occur on different floors and the upstairs encounter may have stopped short of being criminal.[12] *Cf. SL Johnson*, 313 Or at 198-99 (cataloguing, in *modus operandi* case, the numerous dissimilarities that outweighed any similarity that might support use of evidence).

Under those circumstances, the jury reasonably could infer from the "common features" of the two encounters that they shared a common objective—the sexual assault of an unsuspecting library patron. *See Leistiko*, 352 Or at 188 (quoting Wigmore, 2 *Evidence* § 304 at 249, for proposition that "'merely a similarity in the results'" is insufficient to show the existence of a plan; what is required is "'such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations'"). Put another way, there were sufficient (and sufficiently unusual) similarities between the two encounters to support an inference that defendant's behavior was orchestrated in an effort

---

[12] As previously noted, the trial court acquitted defendant of the charges arising from the first encounter.

to bring himself into close contact with women whom he might assault, perhaps with impunity.

Moreover, in addition to satisfying Wigmore's explicit standard for the admissibility of spurious-plan evidence, the proffered evidence also satisfied the "something more than the similarity required *** to prove intent" requirement that the *Leistiko* court attributed to Wigmore. *Leistiko*, 352 Or at 189. That is, although the methodology reflected in defendant's conduct likely falls short of the "signature crime" requirement for *modus operandi* evidence, *see SL Johnson*, 313 Or at 197, given the virtual identity of time, place, and behavior, it more than satisfies the degree of similarity that we and the Supreme Court have typically required before evidence of prior conduct may be admitted to prove intent. *See MA Johnson*, 340 Or at 339-40 (observing that, "when prior crime evidence is to be admitted to prove intent, this court has indicated that a high degree of similarity is helpful but is not essential, and that a distinctive methodology is entirely irrelevant"). As a result, the proffered evidence also satisfies that second requirement for other-acts evidence to be admissible under a spurious-plan theory.

To summarize, given the many similarities between the two encounters, a jury reasonably could infer the existence of a plan—of which each encounter was a manifestation—as well as defendant's "doing of the act designed," that is, assaulting a woman, here, J. *Leistiko*, 352 Or at 188 (internal quotation marks omitted). As a result, the video recording was probative of defendant's mental state in his alleged sexual assault of J. Furthermore, although we, like the Supreme Court, are cognizant of the fact that admitting other-acts evidence as evidence of a plan may sometimes be "vulnerable to the claim that the prior bad acts are merely propensity evidence," *id.*, we do not view the use of the evidence here as raising such concerns to the point of rendering it *irrelevant* under OEC 401 and OEC 404(3). That is, whether or not jurors may be tempted to view the video evidence as suggesting defendant's propensity to engage in predatory behavior, the relevance of the evidence does not require *us* to engage in character-based reasoning. Rather, it relies on the existence of similar episodes of conduct

whose similarities may reflect orchestrated behavior rather than mere coincidence. And to the extent that using the evidence to establish a plan raises an unacceptable risk that the jury will rely upon it as propensity evidence, that is a matter to be addressed through jury instructions and OEC 403, which, as noted above, 315 Or App at 610 n 2, defendant does not invoke on appeal.

In conclusion, the trial court did not err in admitting the challenged security-video footage for the purpose of establishing that defendant had a plan and acted in accordance with that plan. Moreover, we understand defendant's argument that the evidence was not probative of defendant's motive or absence of mistake on his part to be derivative of his argument that the evidence could not properly be deemed evidence of a plan, an argument we have just rejected.[13] Finally, defendant does not contend that, even if the evidence would otherwise have been admissible plan evidence, it was subject to exclusion under OEC 403 or on some other basis. Accordingly, we affirm.

Affirmed.

---

[13] We also note that, in at least some instances, the analysis for admitting other-acts evidence to establish motive may be "strikingly similar" to that applicable to spurious-plan evidence. *See* Imwinkelried, *Uncharged Misconduct Evidence* § 3:23 (2021). Thus, to the extent that the trial court's comments in this case might be viewed as relying more on a motive theory than on a spurious-plan theory, we do not readily see how that approach would be incorrect under the facts of this case.